IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CLEARONE ADVANTAGE, LLC,** | * | |
| **Plaintiff,** | * | |
| v. | * | **Civ. No. JKB-23-03446** |
| **MICHAEL H. KERSEN, *et al.*,** | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

Plaintiff ClearOne Advantage, LLC ("ClearOne") has moved for a Temporary Restraining Order ("TRO") against Defendants Michael H. Kersen and Lamar Gilmore. (ECF No. 3.) ClearOne alleges that the Defendants are former ClearOne employees who have misappropriated the company's confidential customer lead data for the purposes of aiding an unknown competitor. (*Id.* at 1–4.) ClearOne also alleges that the Defendants are actively soliciting current ClearOne employees to provide confidential customer lead information to them, at least as recently as November 2023. (*Id.* at 8–11.) In its 8-count complaint, ClearOne alleges:

- Breach of contract (Count I);
- Violations of the Defend Trade Secrets Act ("DTSA"), U.S.C. § 1839 *et seq.* (Count II);
- Violations of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. Law § 11-1201 *et. seq.* (Count III);
- Violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 (Count IV); and
- Various business torts under Maryland common law (Counts V–VIII).

For the reasons discussed below, the Court will grant in part ClearOne's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 3) insofar as the Motion seeks the entry of a TRO.[1]

---

[1] The Court will defer consideration of the request for a preliminary injunction until the appropriate time.

## I. Factual Background

ClearOne is a financial services company headquartered in Baltimore that helps people develop and implement debt settlement programs with their creditors. (ECF No. 1 at 1.) ClearOne maintains confidential and proprietary lists of "leads," *i.e.*, "persons who might benefit from [ClearOne]'s services." (*Id.* at 2.) The leads are stored on a password-protected internal database. (*Id.*)

ClearOne hired both Defendants in March 2023.. (*Id.* at 8.) The Defendants worked remotely for ClearOne as "account executives." (*Id.*) In that role, the Defendants had access to ClearOne's customer lead database and were assigned to call leads to solicit business. (*Id.* at 2.) Upon joining the company, each Defendant signed a Confidentiality, Nondisclosure and Fair Competitive Practices Agreement ("Confidentiality Agreement") and a Telecommuting Agreement. (*Id.* at 8.) The Confidentiality Agreement provided, *inter alia*, that the employee "may not, at any time, copy, disclose, or make use of Confidential Information for any purpose other than Employer's authorized job performance for the Company." (*Id.* at 9.)

Kersen was fired on May 15, 2023, and Gilmore was fired on November 20, 2023. (*Id.* at 8.) Shortly after Kersen was fired, but before Gilmore was fired, Kersen allegedly began conspiring with Gilmore (who was still employed by ClearOne) to misappropriate ClearOne's lead lists for the benefit of an unidentified competing company. (ECF No. 3 at 2.) As part of the scheme, Gilmore would allegedly log into ClearOne's customer lead database, copy the customer lead information into a separate spreadsheet, and then pass the leads along to Kersen. (*Id.*) After Gilmore was terminated, the Defendants allegedly attempted to recruit at least two other ClearOne employees to join in the scheme. The Defendants offered to pay these current employees thousands of dollars per month in exchange for customer lead data. (*Id.* at 3.) These employees declined to join in the scheme and instead reported the Defendants' efforts to ClearOne. (*Id.*)

ClearOne alleges that "the Defendants remain in a position to solicit other current [ClearOne] employees to join their conspiracy." (*Id.*) ClearOne states that:

> [U]nless temporarily restrained . . . by this Court, the Defendants (who are already armed with previously misappropriated confidential and trade secret information belonging to [ClearOne]) continue to pose an imminent threat of irreparable harm to [ClearOne]'s intellectual property, the security of its business systems, and its contractual relationships with its employees and its good will and economic relations with actual and potential customers.

(*Id.* at 3.)

## II. Legal Standard

The purpose of a TRO is to "preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (quotation omitted). "Because a TRO . . . is 'an extraordinary remedy,' it 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Coreas v. Bounds*, 451 F. Supp. 3d 407, 420 (D. Md. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

The standards for granting a TRO and granting a preliminary injunction are the same. *Maages Auditorium v. Prince George's Cnty., Md.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd*, 681 F. App'x 256 (4th Cir. 2017). Under this standard, a party seeking a TRO must demonstrate that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *See Winter*, 555 U.S. at 20.

Additionally, there are procedural prerequisites to the issuance of a TRO. A court may issue a TRO without notice to an adverse party only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

3

Fed. R. Civ. P. 65(b)(1). Furthermore, "[e]very [TRO] issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record." *Id.* 65(b)(2). The TRO must expire after 14 days at the latest, unless it is extended for a "like period" for good cause. *Id.* 65(b)(2).

## III. Procedural Requirements

A court may enter a TRO "without full notice, even, under certain circumstances, ex parte." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). Here, ClearOne has met the procedural requirements outlined in Federal Rule of Civil Procedure 65(b) necessary for issuance of an ex parte TRO.

ClearOne has attached to its TRO Motion an affidavit by its Chief Operating Officer ("COO") John Wrinn. (ECF No. 3-2.) Wrinn states that the Defendants have attempted to recruit at least two ClearOne employees, Timothy Thompson and Tameka Turner, to join their scheme. (Wrinn Decl. ¶ 26, ECF No. 3-2 at 7.) Wrinn explains that:

> By and through their misconduct, the Defendants have been and continue to compromise the security of [ClearOne]'s business systems and the confidentiality and secrecy of [ClearOne]'s Confidential Information and trade secrets. Unless and until Defendants are ordered to stop using and return [ClearOne]'s Confidential Information and trade secrets, the Defendants can continue to use, sell or otherwise disclose that information for their own benefit.

(*Id.* ¶ 29.) Wrinn also states that the Defendants' actions present a risk of irreparable harm to ClearOne's relationships with its customers and its employees. (*Id.* ¶ 30–31.) These representations suffice to "clearly show that" ClearOne will suffer "immediate and irreparable injury, loss or damage" before the time that the Defendants can be heard in opposition. Fed. R. Civ. P. 65(b)(1)(A).

Additionally, ClearOne's attorney, John McCann, Jr. has certified in writing that he has made numerous attempts to effect service and provide notice to the Defendants of the lawsuit and the TRO proceedings. (*See* ECF No. 7.) McCann sent emails to both Defendants at their last known email address attaching all relevant documents in the case, and although neither Defendant responded, the emails did not "bounce back" as undeliverable. (*Id.*) Additionally, McCann retained process servers to personally serve Kersen and Gilmore in their homes in Denver, Colorado and Lindenhurst, New York, respectively. (*Id.* at 2–3.) The process servers attempted to effect service at their last known addresses, but in both cases were unable to confirm that the Defendants currently live at either location. The process servers also attempted to call each of the Defendants at their last known phone number, again without success. The process servers have unsuccessfully attempted service at alternative addresses, and are currently investigating where the Defendants live so that they can properly serve them. (*Id.*)

These efforts at notice appear reasonable under the circumstances. ClearOne has attempted to provide notice to the Defendants of the TRO hearing through multiple different means, so far without success. This lack of success does not appear to be for want of trying on ClearOne's part; if anything, it suggests that the Defendants may be willfully evading service of process. Under these circumstances, an ex parte TRO proceeding is appropriate.

## IV.    Likelihood of Success on the Merits

ClearOne is likely to succeed on the merits of Counts I, II, and III. Given the expedited nature of a TRO proceeding, the Court will defer consideration of the merits of Counts IV through VIII until its consideration of the concurrent Motion for a Preliminary Injunction.

5

### A. *Breach of contract (Count I)*

ClearOne alleges breach of contract by the two Defendants in connection with (1) their solicitation of employees and (2) their provision of the lead lists to a competitor. ClearOne is likely to prevail on the merits of this claim.

To prevail on a claim for breach of contract, the plaintiff must show at a minimum that (1) the defendant owed a contractual obligation to the plaintiff, and (2) the defendant breached that obligation. *RRC N.E. LLC v. BAA Md., Inc.*, 994 A.2d 430, 442 (Md. 2010). If the contract constitutes a restrictive covenant, Maryland law imposes additional requirements. The Confidentiality Agreement is likely a restrictive covenant because it imposes non-conditional "prohibition[s] on the employee's engaging in competitive work." *Allegis Grp., Inc. v. Jordan*, 951 F.3d 203, 209 (4th Cir. 2020) (quotation omitted). To enforce a restrictive covenant, the employer must show—in addition to the two breach of contract elements above—that (1) the employer has a legally protected interest, (2) the covenant is no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant does not impose undue hardship on the employee, and (4) the covenant does not violate public policy. *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. App'x 435, 438 (4th Cir. 2004) (citing *Silver v. Goldberger*, 188 A.2d 155, 158 (Md. 1963)).

#### 1. *Basic breach of contract elements*

The basic elements of the claim are likely met. First, ClearOne has produced copies of the Confidentiality and Telecommuting Agreements signed by both Defendants. (ECF Nos. 3-3 to 3-6.) These agreements provided that the Defendants agreed, *inter alia*, to maintain the confidentiality of current and prospective customers and to refrain from soliciting customers or current ClearOne employees. (*Id.*) Second, ClearOne has produced evidence showing that Defendants have likely violated the terms of those agreements in several ways by providing

confidential customer information to a competing business and by soliciting current ClearOne employees to participate in disclosing confidential customer information. (*See* Wrinn Decl., ECF No. 3-2 (describing Defendants' alleged scheme); Turner Decl., ECF No. 3-10 (declaration of current ClearOne employee that Defendants asked her to provide them with confidential ClearOne customer information); Thompson Decl., ECF No. 4-1 (same).)

As discussed below, ClearOne has also shown that the additional requirements for enforcing a restrictive covenant are likely to be met.

### 2. *Legally protected interest*

#### a. *Confidentiality of customer lead lists and non-solicitation of customers*

"Employers have a protectable interest in preventing an employee from using the contacts established during employment to pirate the employer's customers." *Gen. Parts Distribution, LLC v. St. Clair*, Civ. No. 11-03556-JFM, 2011 WL 6296746, at *4 (D. Md. Dec. 14, 2011) (quoting *Holloway v. Faw, Casson & Co.*, 572 A.2d 510, 515 (Md. 1990)). The Fourth Circuit has stated that "[r]estrictive covenants almost always serve a legitimate employer interest when they restrict former salespersons who serviced, solicited, and were in constant contact with customers." *Deutsche Post*, 116 F. App'x at 438.

The signed Confidentiality Agreements provide that the Defendants "may not, at any time, copy, disclose or make use of Confidential Information for any purpose other than Employee's authorized job performance for the Company." (Confidentiality Agreement § 3, ECF Nos. 3-3 at 3, 3-5 at 3.) The agreements define "Confidential Information" to include customer lead lists. (*Id.* § 2.) The agreements also prohibit the Defendants from soliciting any actual or potential customers that the Defendants "engaged in business contact with, or learned the identity of, or other Confidential Information about." (*Id.* § 4(c).)

According to ClearOne COO Wrinn, the company "invests millions of dollars monthly in advertising, marketing and other research efforts to develop confidential and proprietary lists of persons who might benefit from [ClearOne]'s services." (Wrinn Decl. at ¶ 4, ECF No. 3-2 at 2.) Wrinn explains that the lead lists "are the lifeblood of [ClearOne]'s business as they enable [ClearOne] to reach potential customers about the value of its services and enroll them in a debt settlement program." (*Id.* at ¶ 11, ECF No. 3-2 at 4.)

Given the importance of the customer lead lists to its business, ClearOne has a legitimate interest in maintaining the confidentiality of this information and in imposing reasonable limitations on former employees soliciting actual or potential customers.

### *b. Non-solicitation of employees*

Employers have a legitimate interest in "preventing former employees from trading on the goodwill they generated during their former employment." *Allegis Grp., Inc. v. Jordan*, Civ. No. GLR-12-2535, 2014 WL 2612604, at *9 (D. Md. June 10, 2014) [hereinafter *Allegis I*], *aff'd*, 951 F.3d 203 (4th Cir. 2020) [hereinafter *Allegis II*]. This interest extends to prohibiting employers from soliciting former colleagues with whom they worked. *Id.*

Here, the Defendants agreed to a provision prohibiting them from soliciting any then-current ClearOne employee "whom [the Defendants] worked with or came to know about as a result of [the Defendants'] employment with the Company." (Confidentiality Agreement § 4(d), ECF Nos. 3-3 at 4, 3-5 at 4.) This non-solicitation provision validly safeguards ClearOne's legally protected interest in preventing former employees from improperly using the goodwill generated from their former employment to benefit a competitor.

### *3. Reasonableness of restraints*

"[A] restrictive covenant in a contract of employment is enforced only insofar as the restraint is reasonable under the circumstances." *Allegis II*, 951 F.3d at 210. The temporal and

geographic scope of the restraint must be no broader than is reasonably necessary. *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641 (D. Md. 1998) (citing *Holloway*, 572 A.2d at 515).

Here, the Confidentiality Agreement limits the period of the non-compete provisions to two years after the termination of the Defendants' employment with ClearOne. (Confidentiality Agreement § 4(a), ECF Nos. 3-3 at 3, 3-5 at 3.) The Agreement also prohibits the employee from working for a list of named competitors within 40 miles of the employee's place of employment. (*Id.* § 4(e).) Furthermore, the restrictions on solicitations of customers and employees are limited to those individuals that Defendants had business contacts with or learned information about, as opposed to a blanket restriction on all solicitations of all customers or employees.

These restraints were reasonable under the circumstances. The two-year time limitation on solicitation is in line with restrictions that Maryland courts have approved in other cases. *See Allegis II*, 951 F.3d at 205–06 (holding that a two-year-long noncompete provision was reasonable); *PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606–07 (D. Md. 2002) (same). And although not all provisions of the Agreement are geographically limited, there is no per se requirement for geographic limitation. *Intelus Corp.*, 7 F. Supp. 2d at 641; *see also Padco Advisors*, 179 F. Supp. 2d at 607 (finding that a restriction with no geographic limitation was reasonable because it was otherwise carefully tailored to limit specific types of competition).

### 4. *Undue hardship*

The Telecommuting and Confidentiality Agreements do not appear to impose undue hardship on the Defendants. The agreements are reasonably limited, as discussed above, and do not present a total bar on the Defendants pursuing similar work in the debt settlement industry. *See Allegis I*, 2014 WL 2612604, at *7 (holding a noncompete provision did not impose undue hardship on employee when the agreement did not prevent the employee from performing similar work). Further, the non-solicitation provisions are limited only to those employees and customers

9

that Defendants actually knew of or contacted during the scope of their employment, as opposed to a broad bar against soliciting *all* former customers or employees, known or unknown. *Cf. Padco Advisors*, 179 F. Supp. 2d at 608 (noting that Maryland law "look[s] with disfavor" on provisions that bar an employee from soliciting *all* former clients, even ones that the employee had never known about).

### 5. *Public Policy*

"[T]he public has an interest in the enforcement of reasonable restrictive covenants." *Intelus Corp.*, 7 F. Supp. 2d at 642. Accordingly, holding Defendants to the terms of the Confidentiality and Telecommuting Agreements would not be contrary to public policy, particularly given the other considerations discussed above.

In conclusion, ClearOne is likely to prevail on the merits of its breach of contract claim.

### B. *Misappropriation of trade secrets (Counts II and III)*

"To establish misappropriation of a trade secret under federal law and Maryland state law, [the plaintiff] must demonstrate that the documents at issue are trade secrets, and that that Defendants misappropriated those trade secrets." *Brightview Grp. LP v. Teeters*, 441 F. Supp. 3d 115, 129 (D. Md. 2020) (citing 18 U.S.C. §§ 1836(b)(1), 1839(3), 1839(5); Md. Code Ann., Com. Law § 11-1201(c)). Both the DTSA and MUTSA permit a court to grant an injunction to prevent "actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A); Md. Code Ann., Com. Law § 11-1202.

Under the DTSA, a trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information," if (1) the owner took reasonable steps to keep the information secret, and (2) the information derives independent economic value from not being generally known or readily ascertainable by potential competitors. 18 U.S.C. § 1839(3). The MUTSA has a functionally identical definition of the term. Md. Code Ann., Com. Law § 11-

1201(e); *see also Philips N. Am. LLC v. Hayes*, Civ. No. ELH-20-1409, 2020 WL 5407796, at *8 (D. Md. Sept. 9, 2020) (noting that "the DTSA and MUTSA define a trade secret in substantially the same manner") (quotation omitted).

The definitions of misappropriation in federal and state law also mirror each other. *Brightview Grp.*, 441 F. Supp. 3d at 132. A person misappropriates trade secrets when they (1) acquire a trade secret that they know or have reason to know was acquired by improper means, or (2) use or disclose the trade secret after acquiring it through improper means. *Id.* (citing 18 U.S.C. § 1839(5)). The plaintiff can show misappropriation "simply by demonstrating that the defendant acquired [the] trade secret by improper means, even if the plaintiff cannot show use of that trade secret." *Id.* (quoting *Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001)).

ClearOne has shown that its customer lead database constitutes a trade secret. First, the list constitutes a form of business information, and ClearOne took reasonable steps to keep the information secret by limiting access to the database only to employees using their assigned ID and password. (Wrinn Decl. ¶ 13, ECF No. 3-2 at 4.) These were reasonable protections under the circumstances. *See Aarow Elec. Sols. v. Trico Sys., LLC*, ___ F. Supp. 3d ___, Civ. No. JKB-22-2363, 2023 WL 6161897, at *7–8 (D. Md. Sept. 21, 2023) (holding that a plaintiff took reasonable protections to secure trade secrets when the information was stored on a password-protected database available only to employees). Second, the information has independent economic value. ClearOne explains that the "the lead lists are *not* mass mailing lists" but are instead comprised of people who have already expressed interest in ClearOne services and provided certain confidential financial information to the company. (ECF No. 3-1 at 24 – 25.) This information, which ClearOne developed using its own research and marketing efforts, could be extremely valuable in the hands of a competitor. *See Albert S. Smyth Co. v. Motes*, Civ. No. CCB-17-677, 2018 WL 3635024, at *4 (D. Md. Jul. 31, 2018) (holding that confidential customer

records and lists constitute trade secrets because they would be economically valuable to a competitor); *Philips N. Am.*, 2020 WL 5407796, at *8–9 (stating that customer lists can constitute trade secrets when "the employer has invested time and resources into the development of the customer information").

ClearOne has also shown that Defendants misappropriated the trade secrets. After Kersen was fired, he conspired with Gilmore to have him secretly pass along the lead lists. Kersen then used the lists to solicit customers for a competing debt settlement business. (ECF No. 3-1 at 10.) After Gilmore was also fired, the two tried to entice current ClearOne employees to pass along the lead information. (*Id.* at 10–11.) These actions constitute misappropriation and attempted misappropriation, respectively. Thus, ClearOne is likely to succeed on its misappropriation of trade secrets claims.

## V.  Irreparable Harm

Having concluded that ClearOne is likely to succeed on the merits of at least three of its claims, the Court next turns to the irreparable harm inquiry. To satisfy this prong, the plaintiff "must make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quotation omitted). Harm is irreparable when it "cannot be fully rectified by the final judgment after trial." *Id.* (quotation omitted).

The Fourth Circuit has recognized that the loss of goodwill in the relevant industry, loss of customers, and loss of the ability to attract new customers are difficult to quantify in terms of money damages and thus may justify injunctive relief. *See Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011). Additionally, courts frequently grant injunctions when there is a substantial risk that the defendants will continue to

divulge or misappropriate trade secrets in the absence of court action. *See Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 138 (D. Md. 2020).

Here, ClearOne is likely to suffer irreparable harm absent immediate injunctive relief. For one, the harm that ClearOne will suffer include loss of goodwill and loss of trade secrets, harm that is difficult to quantify. ClearOne's COO explains that the company "invests millions of dollars monthly in advertising, marketing and other research efforts" to develop its leads lists. (Wrinn Decl. ¶4, ECF No. 3-2 at 2.) Should these lists fall into the hands of a rival, the competitive advantages ClearOne enjoys in the industry could irrevocably disappear, and money damages alone could not recompense this loss. Additionally, at the hearing for the TRO Motion, ClearOne's counsel raised the legitimate concern that the customer lead lists contain sensitive and confidential financial information about prospective customers, information that these individuals have entrusted to ClearOne. The risk of the breach of this sensitive information constitutes another type of irreparable harm.

Furthermore, the Defendants' actions are not confined to the past; they are apparently continuing to the present day. There is a real risk that the Defendants are still attempting to induce current ClearOne employees to share customer lead information with them. The Defendants have contacted ClearOne employees as recently as November 2023, and ClearOne only knows about these contacts because the employees disclosed them. It is entirely possible that the Defendants are continuing to attempt to convince other employees to join their scheme. In other words, "there still exists a 'cognizable danger of [a] recurrent violation' by Defendants, such that injunctive relief is still required." *Brightview*, 441 F. Supp. 3d at 140 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). If the Court does not grant injunctive relief, then the Defendants may continue in their scheme to poach potential customers from ClearOne and divulge ClearOne's trade secrets. This real and imminent threat justifies the granting of the TRO.

## VI.   Balance of the Equities

In deciding whether to grant injunctive relief, the Court must weigh the balance of the equities and the relative harms to the parties. *Scotts Co. v. United Inds. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002). The Court must balance the harm suffered to the plaintiff if the TRO is improperly denied against the harm to the defendant if the TRO is improperly granted. *Id.* at 283–84. Additionally, the Court can properly consider the strength of the probability of success in assessing the balance of the equities. *See id* at 285 (noting that when the relative hardship of the parties is similar, "the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success" (quotation omitted)).

The balance of the equities and the respective hardship to the parties tip strongly in favor of the issuance of a TRO. As the Court has discussed above, ClearOne is likely to prevail on the merits of several of its claims, and is likely to suffer irreparable injury in the form of loss of good will, loss of trade secrets, and loss of potential customers in the absence of injunctive relief. In these circumstances, the hardship to ClearOne if the Court does not issue a TRO is substantial. By contrast, the hardship on the Defendants is fairly minimal. The Defendants can suffer little cognizable hardship from the Court enforcing contracts that they agreed to sign. *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011); *see also Evapco, Inc. v. Mech. Prod. Sw., LLC*, Civ. No. SAG-22-3375, 2023 WL 361131, at *4 (D. Md. Jan. 23, 2023) (noting that the hardship to the defendant of granting an injunction "seems relatively minor, given that the 'relief' that Evapco seeks is merely the enforcement of the parties' non-compete clause").

A TRO will last for no more than two weeks, and the Defendants will have an opportunity to present their side of the story at the preliminary injunction hearing. Should the TRO turn out to be improvidently granted, any harm to the Defendants will be limited by the short temporal

duration of the order. Further, the likelihood of ClearOne's success on at least some of the counts is high. ClearOne has produced copies of the signed Confidentiality and Telecommuting Agreements, has produced affidavits from two different employees testifying to the Defendants' attempts to solicit them, and even has text messages and an audio recording of conversations in which the Defendants sought to recruit a current ClearOne employee to join the scheme. (ECF Nos. 4-2, 4-3.) The Court of course recognizes that this case is in its earliest stage and that the Defendants have not yet responded. Nevertheless, the evidence of wrongdoing at this early stage is compelling. Thus, the balance of the equities tips in ClearOne's favor.

## VII. Public Interest

"[T]he public interest favors the protection of trade secrets, and the prevention of unfair business practices." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 142 (D. Md. 2020). The public interest also favors the enforcement of reasonable restrictive covenants, as they "can play an important role in the growth of a business that depends upon the development of good will through effective customer service." *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 642 (D. Md. 1998).

There are countervailing public interests in fostering robust competition and in securing to each person the "right to labor or use one's skills, talents, or experience for one's own benefit." *Ruhl v. F. A. Bartlett Tree Expert Co.*, 225 A.2d 288 (Md. 1967). But these interests are outweighed when, as here, the Defendants are engaging not in free competition and enterprise but are instead profiting off of misappropriated confidential customer data in violation of their contractual obligations and trade secrets laws. Accordingly, the public interest weighs in favor of issuing a TRO.

## VIII. Conclusion

The Court finds that (1) the procedural requirements for issuance of a TRO are satisfied; (2) ClearOne is likely to succeed on the merits of at least some its claims; (3) ClearOne is likely to suffer irreparable harm in the absence of immediate injunctive relief; (4) the balance of the equities tips in ClearOne's favor; and (5) the public interest favors the issuance of a TRO. Accordingly, the Court will grant in part ClearOne's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 3) and issue a TRO. A separate Order follows.

DATED this 5 day of January, 2024.

BY THE COURT:

James K. Bredar
Chief Judge